<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| YUSUF IBRAHIM, | : | |
| Plaintiff, | : | Civ. No. 19-5021 (GC) (TJB) |
| v. | : | |
| FLORA DEFILIPPO, et al., | : | **OPINION** |
| Defendants. | : | |

<u>**CASTNER, District Judge**</u>

### I.    INTRODUCTION

Plaintiff, Yusuf Ibrahim ("Plaintiff" or "Ibrahim"), is a state prisoner incarcerated at the New Jersey State Prison ("NJSP") in Trenton, New Jersey. He is proceeding *pro se* with an Amended Complaint against Defendant Flora DeFilippo (hereinafter "DeFilippo"). (*See* ECF 59). Presently pending is DeFilippo's Motion for Summary Judgment. (*See* ECF 99). The Court has considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, and for good cause shown, DeFilippo's Motion for Summary Judgment is GRANTED.

### II.    FACTUAL AND PROCEDURAL BACKGROUND

DeFilippo was employed as a doctor at NJSP at the times relevant to Plaintiff's allegations in his Amended Complaint. The four claims against DeFilippo are as follows:

1. DeFilippo acted with deliberate indifference to Plaintiff's serious medical needs related to his mental health (Claims One and Five);

2. DeFilippo violated Plaintiff's medical privacy by meeting with him in the presence of a Correctional Officer and his cellmate on September 18, 2018 (Claim Three); and

3. DeFilippo retaliated against Plaintiff by pre-emptively placing him in segregated housing prior to Plaintiff filing a lawsuit (Claim Ten).

On September 12, 2018, Plaintiff was examined at NJSP's medical clinic for a psychiatric clearance assessment prior to pre-hearing detention. (*See* Def.'s Statement of Undisputed Material Facts, ECF 99-2 ¶ 3). At that time, Plaintiff stated he was brought to the clinic because he refused to be placed in a double-lock (two-person) cell. (*See id.*). A clinic nurse found that there was no single-lock (single-person) order on Plaintiff's chart. (*See id.*). Plaintiff was then clinically cleared for the Restricted Housing Unit ("RHU"). (*See id.*).

The next day, on September 13, 2018, a mental health clinician saw Plaintiff at his cell door. (*See* ECF 99-2 ¶ 4). The mental health clinician noted Plaintiff received charges for refusing to accept housing in a double-lock cell. (*See id.*). Plaintiff referred to the crime he was imprisoned for along with other things that had happened when he was younger as the reasons for why he disliked a double-lock cell. (*See id.*). The mental health clinician noted that Plaintiff would be seen two times per month or as needed on an on-going basis to assess his mental status and overall functioning while housed in the RHU. (*See id.*).

On September 18, 2018, Officer D. Ceiri escorted DeFilippo to perform a mental health visit at Plaintiff's cell door because Plaintiff was agitated. (*See* ECF 99-2 ¶ 5). Plaintiff agreed to talk to DeFilippo at his cell door. (*See* ECF 99-2 ¶ 6).

Plaintiff told DeFilippo about his crimes for which he was incarcerated (murder) and that if he was bothered by his cellmate, he would have to kill him. (*See* ECF 99-2 ¶ 7). Plaintiff told DeFilippo that he should be placed in a single-lock cell because of his mental health, but DeFilippo

told Plaintiff that she would not do so because the issues he was having were not based on his mental illness. (*See id.*). DeFilippo noted that Plaintiff had been "high-functioning" and that Plaintiff had turned his back to talk to her, which demonstrated to DeFilippo that Plaintiff had no hypervigilance towards his cellmate hearing the conversation. (*See id.*). Plaintiff's cellmate indicated that he never heard Plaintiff threaten him during his conversation with DeFilippo. (*See* ECF 80 at 30-31). Officer Cieri stated that he did not hear the conversation between Plaintiff and DeFilippo. (*See id.* at 32).

Medical records indicate that DeFilippo told Plaintiff to plead his case to the administration, but that Plaintiff insisted she do it. (*See* ECF 97 at 24). DeFilippo then told Plaintiff she would relate what he had told her to the administration but that she would not put a single-lock alert in his file. (*See id.*). According to Plaintiff, when he asked her to take notes during their meeting related to his sexual harassment complaints, DeFilippo's responded, "[s]o you can put it in your lawsuit?" (*See* ECF 109-1 at ¶ 4). Plaintiff never saw DeFilippo after this September 18, 2018, meeting at his cell. (*See* ECF 99-2 ¶ 12; ECF 99-3 at 7).

Officer Cieri filed a special custody report on September 18, 2018, at 1:30 p.m. in which he stated:

> On the above date and time I Officer Cieri entered the unit with Dr. DeFilippo to see Inmate Ibrahim, Y #922559 in Cell 24. At this time the unit was locked and secure, and [I] did not hear the conversation that occurred between Dr. DeFilippo and Inmate Ibrahim, Y. #922559.

(ECF 99-3 at 12).

Two hours after seeing Plaintiff on September 18, 2018, DeFilippo filled out a special custody report where she stated:

> IM demanded to see mental health – then told me he can't double lock and that I needed to write that he can only single lock. He said

3

> given the slightest reason he would beat his cellmate [to] death. He
> referred to his crime – murder – where he dismembered his victim
> as an example of how he cannot control himself.

(ECF 99-3 at 10).

Plaintiff was charged with "Threatening With Bodily Harm or With Any Offense Against His Or Her Person or His Or Her Property" arising from what he purportedly told DeFilippo at their September 18, 2018 meeting regarding his cellmate. (*See* ECF 99-2 ¶ 14; ECF 97 at 17; ECF 80 at 34). A nurse then subsequently saw Plaintiff for an initial detention assessment for the administrative segregation unit on September 18, 2018. (*See* ECF 99-2 ¶ 11; ECF 97 at 21-23). The nurse noted in Plaintiff's medical records that there were no medical complications found for inmate housing. (*See* 99-2 ¶ 11; ECF 97 at 22).

By September 19, 2018, Plaintiff had been moved to a single-lock cell. (*See* ECF 97 at 18 (medical records indicating Plaintiff's purported pleasure to psychologist in being placed in a single-lock cell albeit as a consequence for purportedly threatening his prior cellmate)). A psychologist saw Plaintiff at his cell door for a mental health visit on this date. (*See* ECF 99-2 ¶ 13; ECF 97 at 18). The doctor noted that Plaintiff repeated much of what had been memorialized in Plaintiff's mental health records from his September 13, 2018, and September 18, 2018, meetings. (*See id.*). Plaintiff reiterated at that time that his mental health issues were triggered when housed in a double-lock cell. (*See id.*). He further asserted that he should be placed in a single-lock cell for mental health reasons. (*See id.*).

A medical professional then interviewed Plaintiff on September 20, 2018, and indicated Plaintiff was volitional and found Plaintiff was also competent to proceed with the courtline process. (*See* ECF 99-2 ¶ 14; ECF 97 at 17). The medical professional also noted that Plaintiff was to continue with mental health services per protocol. (*See id.*). The medical professional who

4

met with Plaintiff on September 20, 2018, indicated that Plaintiff requested that DeFilippo be removed from his care team (*see* ECF 97 at 16). This apparently occurred as DeFilippo never met with Plaintiff after their September 18, 2018, meeting. (*See* ECF 99-2 ¶ 12).

On September 24, 2018, an NJSP clinician saw Plaintiff for a follow-up visit. (*See* ECF 99-2 ¶ 15; ECF 97 at 13). The clinician noted Plaintiff's mood was euthymic and his affect was appropriate, but that Plaintiff expressed he had extreme mood swings and anxiety related to his wanting/need to be in a single-lock cell. (*See id.*). The clinician noted that Plaintiff did not have a single-lock cell on his medical chart because it was not clinically indicated based on his mental health issues. (*See id.*). As Plaintiff had been advised in the past, this clinician told Plaintiff to submit his request for single-lock classification to the NJSP administration for their consideration. (*See id.*). The clinician further noted that Plaintiff would continue to have routine mental health visits two times per month and as otherwise needed or requested by him. (*See* ECF 99-2 ¶ 15; ECF 97 at 14).

On September 29, 2018, Plaintiff had another mental health visit. (*See* ECF 99-2 ¶ 16; ECF 97 at 9-12). Plaintiff indicated to the doctor who examined him that he wanted to complain about mental health staff for whom he blamed for his placement in administrative segregation. (*See* ECF 99-2 ¶ 16; ECF 97 at 10). Plaintiff's medical records indicate that the doctor who saw Plaintiff on this date told Plaintiff to focus on his treatment. (*See id.*).

On October 4, 2018, a psychologist saw Plaintiff at his cell. (*See* ECF 99-2 ¶ 17; ECF 97 at 6-9). During this mental health visit, Plaintiff expressed that he felt "betrayed" by a clinician for whom he had "only reported [his] issues with cell mates and expressed worry to what could happen, not that [he] threatened anyone." (*See* ECF 99-2 ¶ 17; ECF 97 at 7). Plaintiff further

5

stated to the psychologist his dislike of double-lock cells. (*See id.*). The psychologist noted that

Plaintiff would be seen for follow-up by mental health professionals. (*See id.*).

Finally, on October 19, 2018, Plaintiff had another psychological visit. (*See* ECF 99-2 ¶

18; ECF 97 at 2-5). Plaintiff's medical records indicate that he told the psychologist at this visit

that his overall mental health was not well. (*See* ECF 97 at 3). Plaintiff indicated that he felt

"betrayed" by other clinicians which led to his placement in his current housing unit. (*See* ECF

99-2 ¶ 18; ECF 97 at 3). Plaintiff's records indicate he explained to the psychologist his inability

to be in a double-lock cell due to his perceived diagnosis of "Intermittent Explosive Disorder."

(*See* ECF 97 at 3). The psychologist noted in Plaintiff's records that while he had been directed

in the past to request a single-lock classification, it appeared that he had not done so. (*See* ECF

99-2 ¶ 18; ECF 97 at 3). The psychologist noted that "[f]rom a mental health perspective, patient

remains adequately housed in his current location and present classification status." (*See id.*). The

notes indicated the need to continue seeing Plaintiff two times per month per mental health

protocols and as otherwise needed or requested by Plaintiff. (*See id.*).

Plaintiff initially filed this federal civil action in February 2019 against numerous

Defendants, including DeFilippo. (*See* ECF 1). In May 2020, Plaintiff filed an Amended

Complaint. (*See* ECF 59). In July 2020, DeFilippo (along with other defendants no longer in this

action), filed a Motion to Dismiss the Amended Complaint for failure to state a claim pursuant to

Federal Rule of Civil Procedure 12(b)(6). (*See* ECF 65). With respect to Plaintiff's Claims One

and Five against DeFilippo, the Court permitted these claims to proceed against DeFilippo noting

as follows:

> Plaintiff's first and fifth claims relate to Plaintiff's claims that on
> September 18, 2018, he was experiencing PTSD symptoms and Dr.
> DeFilippo "believe[d] there was a substantial risk of harm."
> (Amend. Compl. at 1.) However, Dr. DeFilippo provided no

6

> treatment, instead, he told a "convoluted version [of their conversation] to prison officials" causing Plaintiff to be placed in disciplinary segregation. (*Id.* at 4.) Plaintiff submits that he was placed in segregation, and, for the entirety of his segregation, his symptoms were left untreated. (*Id.* at 8.) Plaintiff submits that Dr. DeFilippo never followed up with Plaintiff regarding his symptoms. (*Id.*) Plaintiff submits the lack of treatment caused a deterioration of his symptoms, which led to his placement in MCU segregation following an altercation with a fellow inmate. (*Id.* at 8-9.) Plaintiff submits his PTSD symptoms are still apparent and he still has not been treated. (*Id.* at 9.)
>
> Upon review of Plaintiff's allegations against Dr. DeFilippo regarding the September 18, 2018 incident and after, they are sufficient to withstand the scrutiny on a motion to dismiss. Because the Court has not been presented with opportunity to review Plaintiff's relevant medical records, determinations regarding Plaintiff's need for treatment and what treatment was provided cannot be reached. While the lack of treatment could reflect a decision about the proper course of treatment, such allegations could also show an intentional refusal to provide care, which would establish deliberate indifference. *See Monmouth Cty. Corr. Inst. Inmates* [*v. Lanzaro*], 834 F.2d [326,] 346 [(3d Cir. 1987)]. As such, it simply cannot be determined on a motion to dismiss as to whether a cognizable claim of deliberate indifference has been stated. Dr. DeFilippo's request for dismissal of claims one and five will be denied.

*Ibrahim v. DeFilippo*, No. 19-5021, 2021 WL 753898, at *6 (D.N.J. Feb. 26, 2021). Plaintiff's

Claim Three related to DeFilippo's purported violation of his right to medical privacy from her

meeting with Plaintiff at his cell on September 18, 2018. The Court permitted that claim to proceed

stating:

> Plaintiff's third claim submits his right to medical privacy was violated. (Amend. Compl. at 4-5.) Plaintiff states psychiatry sessions are performed on open housing units among other inmates and the doctors are always escorted by corrections officers. (*Id.*) Plaintiff submits the corrections officers "encroach on the dialogue forcing [Plaintiff] to reveal sensitive concerns, or forfeit treatment." (*Id.* at 4.) Plaintiff submits fellow inmates eavesdrop. (*Id.*) Plaintiff submits on September 18, 2018, Dr. DeFilippo forced Plaintiff to reveal the reason behind his behavior in the presence of cellmate F. Chireno and escorting officer D. Cieri. (*Id.*) . . . .

"An individual has a constitutional right to privacy which protects 'the individual interest in avoiding disclosure of personal matters.' We have long recognized the right to privacy in one's medical information. . . ." *Doe v. Delie*, 257 F.3d 309, 315 (3d Cir. 2001) (quoting *Whalen v. Roe*, 429 U.S. 589, 599 (1977)). "[A] prisoner's right to privacy in this medical information is not fundamentally inconsistent with incarceration." *Id.* at 317.

That being said, "a prisoner does not enjoy a right of privacy in his medical information to the same extent as a free citizen . . . . [Plaintiff's] constitutional right is subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and maintain institutional security." *Id.* "[A]n inmate's constitutional right may be curtailed by a policy or regulation that is shown to be reasonably related to legitimate penological interests." *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

The Third Circuit has yet to define the parameters of a prisoner's right to privacy in his medical information. *See Smith v. Hayman*, 489 F. App'x 544, 549 (3d Cir. 2012) ("[*Delie*] did not establish any such rule with 'obvious clarity.'"). Courts construing prisoner's medical privacy claims have framed the right narrowly and have applied it to situations involving "an unusual medical condition which, if disclosed unnecessarily, would likely expose the inmate to ridicule, discrimination, or even potential violence and harm, particularly when word of the condition is likely to spread through 'humor or gossip[.]'" *Smith v. Hayman*, No. 09-2602, 2012 WL 1079634, at *18 (D.N.J. Mar. 30, 2012) (quoting *Powell v. Shriver*, 175 F.3d 107, 112–13 (2d Cir. 1999)), *aff'd*, 489 F. App'x 544 [(3d Cir. 2012)] (alteration in original). Most cases concern revealing an inmate's HIV-positive status or that they are transgender. *See, e.g., Doe*, 257 F.3d 309 (HIV-positive); *Powell*, 175 F.3d 107 (transgender identity); *Smith*, 2012 WL 1079634 (transgender identity). *Cf. Vines v. Columbus House et al.*, No. 13-3923, 2017 WL 2539409, at *14 (D.N.J. June 12, 2017) (holding plaintiff did not state claim for disclosure of asthma, back problems, high blood pressure, and allergies to mold, dust, spray chemicals, and smoke).

Here, Plaintiff's condition was PTSD [Post-Traumatic Stress Disorder] and he submits he was forced to reveal how he was feeling on September 18, 2018 in front of his cellmate and the escorting corrections officer. Plaintiff alleges generally that doctors see Plaintiff in an open setting where other inmates can eavesdrop and glean information to be weaponized against him at a later time.

> Assuming that Plaintiff's PTSD symptoms were disclosed in front
> of other inmates and corrections officers, the Court is unable, at this
> juncture, to find that PTSD is commonplace and does not constitute
> an "unusual medical condition, which, if disclosed unnecessarily,
> would likely expose the inmate to ridicule, discrimination, or even
> potential violence." *Smith*, 2021 WL 1079634, at *18. The
> Defendants' argument that the corrections officers escorted Dr.
> DeFilippo for security purposes argues facts outside of Plaintiff's
> amended complaint and is an argument more appropriately raised in
> a motion for summary judgment. As such, it cannot be determined
> on a motion to dismiss as to whether a cognizable claim of violation
> of right to medical privacy has been stated. Dr. DeFilippo's request
> for dismissal of claim three is be denied.

*Ibrahim*, 2021 WL 753898, at *6–7. Finally, the Court noted that Claim Ten alleging retaliation

against DeFilippo would proceed because DeFilippo did not move to dismiss that claim. *See id.*

at *14 n.10.

DeFilippo filed an Answer to the Amended Complaint on March 26, 2021. (*See* ECF 78).

In March 2022, DeFilippo filed a Motion for Summary Judgment. (*See* ECF 99). On April 11,

2022, this matter was reassigned to the undersigned. (*See* ECF 107). Plaintiff submitted a

Response in Opposition to DeFilippo's Motion for Summary Judgment. (*See* ECF 109-1; ECF

114). DeFilippo then filed a Reply in Support of her Motion for Summary Judgment. (*See* ECF

112).

## III.   LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing

law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). Disputes over irrelevant or unnecessary facts will not preclude the Court from granting a motion for summary judgment. *See id.*

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "A party asserting that a fact [is not] genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents . . . affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *See Anderson,* 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.,* 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson,* 477 U.S. at 249-50). "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson,* 477 U.S. at 250-51. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson,* 477 U.S. at 255).

10

## IV.   DISCUSSION

### A. Claims One and Five

In Claims One and Five, Plaintiff asserts that DeFilippo was deliberately indifferent to his

serious medical needs.

> For the delay or denial of medical care to rise to a violation of the
> Eighth Amendment's prohibition against cruel and unusual
> punishment, a prisoner must demonstrate "(1) that defendants were
> deliberately indifferent to [his] medical needs and (2) that those
> needs were serious." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir.
> 1999).   Deliberate indifference requires proof that the official
> "knows of and disregards an excessive risk to inmate health or
> safety." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582
> (3d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114
> S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).  We have found deliberate
> indifference where a prison official: "(1) knows of a prisoner's need
> for medical treatment but intentionally refuses to provide it; (2)
> delays necessary medical treatment based on a nonmedical reason;
> or (3) prevents a prisoner from receiving needed or recommended
> treatment." *Rouse*, 182 F.3d at 197.  Deference is given to prison
> medical authorities in the diagnosis and treatment of patients, and
> courts "disavow any attempt to second-guess the propriety or
> adequacy of a particular course of treatment . . . (which) remains a
> question of sound professional judgment." *Inmates of Allegheny
> Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting
> *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).  Allegations
> of negligent treatment or medical malpractice do not trigger
> constitutional protections. *Estelle v. Gamble*, 429 U.S. 97, 105-06,
> (1976).

*Pierce v. Pitkins*, 520 F. App'x 64, 66 (3d Cir. 2013).  Deliberate indifference can also be found

"where the prison official persists in a course of treatment in the face of resultant pain and risk of

permanent injury." *See McCluskey v. Vincent*, 505 F. App'x 199, 202 (3d Cir. 2012) (internal

quotation marks and citation omitted).  "A medical need is serious if it 'has been diagnosed by a

physician as requiring treatment,' or if it 'is so obvious that a lay person would easily recognize

the necessity for a doctor's attention.'" *See Mitchell v. Beard*, 492 F. App'x 230, 236 (3d Cir.

11

2012) (*quoting Atkinson v. Taylor*, 316 F.3d 257, 272-73 (3d Cir. 2003) (quoting *Monmouth Cnty. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987))).

Plaintiff fails to state a deliberate indifference claim against DeFilippo in Claims One and Five. Plaintiff makes clear in his Amended Complaint that Claims One and Five relate entirely to DeFilippo's meeting with him on September 18, 2018. Plaintiff may have disagreed with the length of this encounter as well as DeFilippo's diagnosis and analysis regarding his mental health, but mere disagreement with a doctor's diagnosis and treatment plan is insufficient to state a deliberate indifference claim. *See Hairston v. Dir. Bureau of Prisons*, 563 F. App'x 893, 895 (3d Cir. 2014) ("No claim of deliberate indifference is made out where a significant level of care has been provided, and all that is shown is that the prisoner disagrees with the professional judgment of a physician, or that a different physician has in the past taken a different approach to the prisoner's treatment."). Despite Plaintiff's allegations in his Amended Complaint, medical professionals followed up and evaluated Plaintiff's mental health in the days and weeks after Plaintiff's last meeting with DeFilippo on September 18, 2018. Indeed, it appears the medical professionals at NJSP met with Plaintiff even more than the two times per month as indicated in his medical records.

While Plaintiff may disagree with the handling of his mental health by the medical professionals at NJSP, the record indicates that there was a treatment plan put in place which included regular scheduled mental health visits with Plaintiff. Furthermore, it is worth noting that after Plaintiff allegedly threatened his inmate due to his mental state in front of DeFilippo, Plaintiff was then apparently housed in a single-lock cell at least for a period of time (albeit along with a disciplinary charge for purportedly making the threat). Finally, Plaintiff's medical notes indicate (and Plaintiff does not challenge) that he requested DeFilippo no longer be part of his mental health

team which was apparently followed as DeFilippo never met with Plaintiff again after their September 18, 2018, meeting. Accordingly, for these reasons, DeFilippo is entitled to summary judgment on Plaintiff's deliberate indifference claims on Claims One and Five of his Amended Complaint.

## B. Claim Three

In Claim Three, Plaintiff claims DeFilippo violated his right to medical privacy by conducting a mental health review at Plaintiff's cell door on September 18, 2018, in the presence of his cellmate and Officer Cieri.

There exists a "constitutional right to privacy in one's medical information . . . in prison[.]" *Bracey v. Huntingdon Cty.*, 781 F. App'x 73, 77 (3d Cir. 2019) (citing *Doe v. Delie*, 257 F.3d 309 (3d Cir. 2001)). Courts construing prisoner's medical privacy claims have framed the right narrowly and have typically applied it to situations involving "an unusual medical condition which, if disclosed unnecessarily, would likely expose the inmate to ridicule, discrimination, or even potential violence and harm, particularly when word of the condition is likely to spread through 'humor or gossip[.]'" *Smith v. Hayman*, No. 09-2602, 2012 WL 1079634, at *18 (D.N.J. Mar. 30, 2012) (quoting *Powell v. Shriver*, 175 F.3d 107, 112–13 (2d Cir. 1999)), *aff'd*, *Smith*, 489 F. App'x 544 (3d Cir. 2012) (alteration in original); *see also Nifas v. Belles*, No. 19-538, 2020 WL 6799915, at *4 (M.D. Pa. Nov. 19, 2020) (noting courts have construed prisoner's right to medical privacy narrowly); *Vines v. Columbus House*, No. 13-3923, 2017 WL 2539409, at *14 (D.N.J. June 12, 2017) (holding plaintiff did not state claim for disclosure of asthma, back problems, high blood pressure, and allergies to mold, dust, spray chemicals, and smoke).

There is no material issue of fact related to any possible violation by DeFilippo with respect to Plaintiff's right to medical privacy. DeFilippo's statement of undisputed material issues of fact

indicates that Plaintiff agreed to talk to DeFilippo at his cell door on September 18, 2018. (*See* ECF 99-2 ¶ 6). Plaintiff does not contest this point in his "Statement of Disputed Material Facts." (*See* ECF 109-1). Given Plaintiff's consent, this Court fails to see (even if Plaintiff had a right to medical privacy) how such a right was violated in this instance. *See, e.g., Braxton v. Webster*, No. 06-1191, 2007 WL 3091555, at \*2 (S.D. Ind. Oct. 19, 2007) (noting even where right to medical privacy exists in a prison, right was not violated where the plaintiff consented to someone else's presence at his medical appointments). By consenting to his meeting with DeFilippo at his cell door, Plaintiff would have been aware that his cellmate and/or Officer Cieri could have overheard the conversation. *Cf. Braxton*, 2007 WL 3091555, at \*2 ("some amount of sharing of medical information in areas where it might be overheard by other patients-e.g., in hospital emergency rooms, school infirmaries, and the waiting room of a doctor's office-is commonplace."). Furthermore, at least with respect to Officer Cieri, Plaintiff does not challenge Officer Cieri's statement with any relevant outstanding issue of fact that he did not hear what transpired during Plaintiff's conversation between DeFilippo.

Thus, this Court finds that Plaintiff fails to show that there is a material issue of fact related to any possible violation of Plaintiff's medical privacy to the extent such a right exists in this case. Accordingly, DeFilippo is entitled to summary judgment on Claim Five.

## C. Claim Ten

In Claim Ten, Plaintiff argues DeFilippo retaliated against him for pursuing his First Amendment rights. Plaintiff's retaliation claim relates to DeFilippo's response to him during their September 18, 2018, meeting at his cell when he asked her to take notes and she purportedly responded, "why, so you can put it in your lawsuit?" (ECF 59 at 11). Plaintiff asserts in his

Amended Complaint that DeFilippo retaliated against him by then pre-emptively placing him in segregated housing before he filed suit.

"A prisoner alleging retaliation must show (1) constitutionally protected conduct, (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal connection between the exercise of his constitutional rights and the adverse action taken against him." *Mack v. Yost*, 427 F. App'x 70, 72 (3d Cir. 2011) (quoting *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)). The filing of a complaint is constitutionally protected conduct. *See Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997) (filing of civil complaint is constitutionally protected conduct under the First Amendment).

DeFilippo is entitled to summary judgment on Plaintiff's First Amendment retaliation claim. Plaintiff fails to show that he engaged in constitutionally protected conduct before DeFilippo met with him on September 18, 2018, and subsequently place him in segregated housing.

Plaintiff admits in his Amended Complaint that he had never filed a lawsuit prior to his meeting with DeFilippo on September 18, 2018. (*See* ECF 59 at 11). It was only *after* Plaintiff had been in segregated housing for months after his final meeting with DeFilippo on September 18, 2018, that he purportedly engaged in constitutionally protected conduct by filing a complaint. (*See id.*). Based on this record, Plaintiff fails to show that there is a material issue of fact outstanding with respect to his retaliation claim against DeFilippo. *See, e.g., Elder v. Silva*, No. 16-1925, 2021 WL 1102996, at *10 (E.D. Cal. Mar. 23, 2021) ("Absent Plaintiff engaging in some protected activity *prior to an adverse action*, and absent [the defendant's] knowledge of such activity, Plaintiff cannot establish that [the defendant's] conduct was motivated by the protected activity. As such, Plaintiff cannot establish an essential element of his retaliation claim against [the

15

defendant]."); (emphasis added); *report and recommendation adopted*, 2021 WL 1754606 (E.D. Cal. May 4, 2021) *Booze v. Wetzel*, No. 12-1307, 2015 WL 1219259, at *12 (M.D. Pa. Mar. 17, 2015) (noting with respect to defendant Meyers that plaintiff could not pursue retaliation claims where Plaintiff failed to show he was engaged in constitutionally protected conduct at the time adverse action was taken against him); Accordingly, DeFilippo is entitled to summary judgment on Claim Ten.

## V.  CONCLUSION

For the foregoing reasons, DeFilippo's motion for summary judgment is granted.[1]  An appropriate order shall be entered.

DATED: November ___, 2022

GEORGETTE CASTNER
United States District Judge

---

[1] Certain claims against Defendants other than DeFilippo were dismissed without prejudice at the motion to dismiss stage.  Plaintiff never filed a proposed second amended complaint to correct any noted deficiencies.  This Court presumes that had Plaintiff wished to proceed with any claims previously dismissed without prejudice in his Amended Complaint decided over eighteen months ago that he would have submitted a proposed second amended complaint in the interim. Accordingly, this Court construes such inaction as Plaintiff wishing to stand on his Amended Complaint as the operative pleading.  Given DeFilippo is the only remaining active Defendant, the Clerk will therefore be ordered to mark this case as closed given that summary judgment shall be entered in her favor on Plaintiff's claims raised against her.